Bostrom for the SELA Appellants. With the Court's permission, I'd like to reserve four minutes for rebuttal. The core issue here is that BLM misinterpreted the Reserves Act to require full field development and to exclude more protective options. That is contrary to the Reserves Act. It also led BLM to violate two additional statutes, ANILCA Section 810, because the NEPA, because BLM did not consider a reasonable range of alternatives. So, Counsel, just to be efficient with our time here, can you focus on the ways that your argument on these points about full field development might differ from the prior plaintiffs? Certainly. I think that many of the concerns that we have are very similar. I would like to emphasize a few different aspects of the statute as well as the record, though, to reinforce many of the same points. Under the Reserves Act, while Congress provided for an oil and gas program, it also was very clear that it wanted protections. For example, it requires that oil and gas activities assure maximum protection in special areas like Teshekpuk Lake. It also says that BLM shall include any conditions, restrictions, or even prohibitions on oil and gas activities to ensure that it is protecting the Reserve more broadly. These obligations are continuing, and they do not end when BLM issues a lease. Under BLM's interpretation that was adopted by the District Court, the agency can only impose these protections insofar as they would be consistent with full field development. That is contrary to the plain language and would nullify the purpose of these protective provisions. So, one of the things I'm struggling with here a little bit is, like, what does mitigation mean in this context? Because I think it's really hard to argue that the Reserve Act is not a pro-development statute, given the context that it was adopted in and given its language as it being sort of a key twin mandate to develop. We've got to deal with that, right? And so, in that context, what does mitigation mean? Can mitigation mean taking measures to minimize impacts that are going to happen because we're not going to develop? Or can mitigation also mean we're just not going to develop because that's the way you minimize impacts? Go ahead. Sorry. The agency has broad authority here to adopt various mitigation measures. There's a wide range of options, including going so far as to outright prohibit activities. So, if it did the outright prohibit, I guess then the two questions are, how is that meeting the twin mandates? I think the case law talks about the twin mandates of the Reserve Act. Develop and do so in a way that you can minimize impacts of development. So, if you say, we're just not going to, how do we meet both objectives? So what was available to the agency here was to look at far more than what it did. So here, it cabined its authority to only look at full field development and only looked at a limited range of alternatives that were consistent with that screening criteria. But like the court recognized in Kempthorpe and as is acknowledged in the Reserves Act, the agency had far broader authority. Whether they could outright deny the full project here is not an issue. But what is clear here is that they had much broader authority than was reflected by the fact that they constrained it by full field development. So there were other measures. There were other protective provisions, such as potentially eliminating infrastructure from Teshikpuk Lake or moving infrastructure out of other sensitive areas like Fish Creek that could have been implemented here consistent with that statutory obligation while still allowing some amount of oil development and also potentially achieving greater protections consistent with those dual mandates. Well, thinking about the lake special area in particular, I'm looking at Section 6504 of the statute. And Provision A of that statute seems to just out now anticipate there would be development activity within that special area and then says, when that happens, you've got to do maximum protection. But that concept of maximum protection in that statute seems to be built on the premise that development's going to happen there. Am I wrong? Am I reading that wrong? No. It is possible for development to take place in Teshikpuk Lake. It's not our position that it's not possible, but it is also possible for the agency under the Reserves Act to restrict that infrastructure, particularly where the impacts are too significant. So here, the agency had much more leeway with what it did than what it did, and it could have looked at potentially more protective alternatives like that. And I assume that you agree with the other plaintiffs that that sort of point of contracting or the issuance of the lease matters less than what the defendants are suggesting. I'm sorry, I'm not sure I totally follow what the question was. Could you? I mean, I asked a question to the other plaintiffs about the case law and the statute that seems to suggest that the point at which the government decides to issue an oil and gas lease is a point in which it can be more restrictive and say, not going to issue a lease to cover this particular special area or this particular, I mean, geographic piece that we really want to protect. But once you issue the lease, if it covers an area, then the government's ability to mitigate or to restrict changes in character. Do you agree with that? To some extent, but also in both Kempthorne as well as the Connor cases, the court still recognized that the agency does have broad authority to potentially put conditions, put restrictions and prohibitions with the goal to achieving the protective mandates that are also there under the Reserves Act. And so in the Kempthorne court decision, the court recognized that that could mean going in so far as to deny an outright proposal, but also recognized that there still was this broad leeway. The decision here does not reflect that the agency used that broad leeway because it curtailed its authority and only looked at alternatives that were consistent with full field development. So what is the overlay of ANILCA to all this, to the agency's analysis? Yes. Turning to ANILCA, Section 810 requires the agency to take affirmative steps to reduce the impacts to subsistence. Those requirements are fundamental to achieving ANILCA's purpose of reducing the impacts to subsistence. Section 810 should be read as a whole, and in light of that purpose, BLM needs to consider alternatives to try and minimize those impacts, and it must also ensure that it is not authorizing a project unless it finds that it involves the minimal amount of public lands necessary and that it has taken reasonable steps to reduce those impacts. And I understand part of Celia's argument is that it's the same claim as before, where if the agency misconstrues its authority, it hasn't considered the full range of alternatives that would, in a more fulsome way, address the subsistence impacts. Is there anything beyond that that you were claiming under ANILCA? Our claims are focused on Section 810, both with the agency's failure to consider alternatives to reduce the use of public lands necessary for subsistence, as well as the agency's failure to then appropriately make the very related findings that they have, in fact, reduced the amount of land that's being used, as well as taken additional restrictive measures. This is very similar to the Tenekee Springs case, where the agency had similarly restrained its authority and operated under the assumption that it needed to allow a certain amount of development. Here, the agency similarly constrained its authority and did not look at the full scope of what it could and should have looked at for purposes of ANILCA to minimize impacts because it constrained it with this full field screen. So the agency here ultimately did not comply with ANILCA because it tied its hands and did not fully consider the ways in which it could have reduced impacts to subsistence. So the ANILCA claim rises and falls with how we decide this full field development issue that we've been discussing this morning? I think it's very relevant. I don't think that the ANILCA obligations necessarily fall if you do not agree on that premise. The agency still had independent obligations to look at ways... And how did it not satisfy those obligations? Because it still did not look at anything broader than what it was considering for purposes of full field development. So what it looked at was still constrained by its assumption that it needed to allow for full development of the leases. But I thought you said that there was an independent basis apart from the full field development issue in which the agency failed to comply with its obligations under ANILCA. Apologies. I was referring to the fact that there are independent statutory obligations under 810 that push the agency to affirmatively minimize the impacts to subsistence. One other piece on ANILCA is that the alternative E did not fix these problems. BLM acknowledged that all of the action alternatives would cause significant restrictions to subsistence. For alternative E, BLM found that it would not substantially reduce direct impacts and that there would only be a minor reduction in indirect impacts. And BLM itself said that the difference in direct impacts between alternative E and the other alternatives was, quote, minimal. Ultimately, though, the point is not whether alternative E minimized some of the impacts. The point is that had BLM not treated the oil and gas program as mandating full field development, BLM could have considered more protective options and alternatives. Turning briefly to ANILCA, BLM also, excuse me, turning briefly to NEPA, BLM also did not consider a reasonable range of alternatives because of how it limited itself under the Reserves Act. BLM was obligated to look at a reasonable range of alternatives, and it was not reasonable here for them to only look at alternatives that varied recovery by a few percentages. Everything was still constrained by this lens that they needed to allow for full field development. And how would you respond, you know, counsel for government has pointed out a couple of times now that we shouldn't look at this based on percentage of extraction, but more the impacts on surface lands. Does that affect your analysis in any way? No, because the agency still ruled out what were reasonable alternatives based on this assumption that it could only look at scenarios that allowed for full field development. So this is very similar to cases like California v. Block, where the agency there assumed, even in looking at numerous alternatives, that they had to allow a significant amount of development. Here, the agency similarly assumed it had to allow a significant amount of development and did not look at potentially more protective options because of how it constrained that authority. If the court has no further questions, I would reserve my time. I don't. Thank you. Thank you very much. Good morning. Again, your honors. Again, Amy Collier on behalf of the federal defendants. With me at council table for this case is Patrick Munson, representing Cookpit Corporation. And I, again, plan to reserve five minutes for him. I'd like to address a couple of points that I think were lost in that discussion. One, there was some discussion about whether BLM could have outrightly prohibited any sort of infrastructure or development within the Chickapook Lake Special Area. I want to step back again and say that BLM's obligations and authority under the Naval Petroleum Reserves Production Act applies across the 23 million acre petroleum reserve. And in that context, BLM has already prohibited infrastructure and development in the vast majority of that special area and in 48% of the petroleum reserve more generally. So in the area that the BLM has completely restricted access to for oil production, was any of that area covered by a lease? No, that has not been leased. That is closed to leasing. I guess that gets back to the question of sort of at what moment, it seems to me one of the key questions in this analysis is, at what moment does the government really have the ability to sort of segregate off areas that we say, this is just, we're not going here because there's too many environmental, ecological, you know, things at stake. So we're not going to do oil and gas production in that region. And is it your position, my understanding from the briefing, it's your position that that's mostly at the leasing stage? I think that's at the leasing stage and at the integrated activity plan stage, both of which involved environmental analyses under NEPA. The most recent was a 2020 EIS for the integrated activity plan, where again, BLM analyzed different alternative development scenarios across the petroleum reserve more broadly and ultimately adopted a proposal or a layout in the 2022 Record of Decision that again closed a majority of the Tishnek-Pook Lake Special Area, as well as the majority or 48% of the petroleum reserve. So sort of big picture, once the government issues a non-NSO lease, which is what we have here, what is its scope of authority with regard to the leaseholder? So I think this court's decisions in Connor and Kempthorne provide some language there. And again, plaintiffs sort of discussed the fact that Kempthorne says, well, BLM could preclude development on some of those leases. But the language more specifically says that if it's a particularly sensitive area and we assume BLM could prohibit development activity there. That's not what we necessarily have here with regard to these leases that allow for surface infrastructure in these areas. Now BLM did in alternative E, both in the EIS and in the ROD, did determine that it would remove one of the drill sites in the TLSA and ultimately thus has 43% less surface infrastructure in those areas than ConocoPhillips had proposed. It also, across the alternatives it studied in its NEPA analysis, alternative C would have had 179 acres of development in the Tishookbook Lake Special Area. So again, BLM wasn't just looking at yes infrastructure, no infrastructure in the Tishookbook Lake Special Area. It was looking at a range of potential infrastructure and surface disruptions, both within that and across the leases more broadly. Alternative E also has a shorter construction time. It has fewer vehicle trips, fewer aircraft trips. All of these were identified by BLM as things that could cause impacts to surface resources, including caribou and other sort of ecological concerns in that area. So I think, yes, the sale of those non-NSO leases does carry with it a constraint on BLM's authority, as this court said in Connor and Kempthorne. But BLM does retain some discretion, again, to mitigate for particularly sensitive areas, which is exactly what it did here. And I would also note that in Connor itself, in discussing what those mitigation measures might look like, the court does not say, you know, less oil production or reduce greenhouse gas emissions. It speaks specifically to different design configurations and infrastructure configurations and operation of infrastructure in these areas. And again, when you look at those factors, I think the range of alternatives considered in the NEPA analysis vary quite a bit. So I would like to also address a couple of the ANILCA arguments. I think Mr. Munson will focus more on the ANILCA arguments, but I want to just direct this court's attention to the various places where BLM did comply with its statutory authority under ANILCA. So Appendix G of the EIS contains BLM's analysis under Tier 1 of ANILCA, where it goes through each of the alternatives and, again, makes that determination under the text of the statute whether those alternatives would substantially restrict subsistence uses. And it looks at the alternatives in isolation. It looks at the alternatives in terms of the cumulative case. And it looks at the particular factors that go into play in making that determination. Again, this court has routinely applied this Tier 1, Tier 2 step process for ANILCA. And then in Appendix B of the Record of Decision, BLM makes its Tier 2 determinations, where it, again, complies with the text of the statute in that it determines that this use of land is necessary to achieve, again, the purpose of the project here, which is baked into the statute itself, but also in this case law that the court considers the purpose of the project, consistent with sound principles for the utilization of this land, that it involves that modified alternative E with its further reduction in surface infrastructure and other sort of disruptions involves the minimal amount of land necessary for this purpose. And then I would like to push back specifically on the claims that BLM did not take reasonable steps to mitigate impacts. Again, the statutory language is reasonable steps to mitigate. BLM included a number of mitigation measures that are specific to this project itself. Those can be found in Appendix A of the Rod. But also it works more, it works in concert with the Integrated Activity Plan and the Petroleum Reserve in that sense. And I think Mr. Renton will speak to some specific measures. But for example, one of the measures that was specifically advocated for by subsistence users was number 27, which provided compensatory mitigation specifically to the Tishikbek Lake Coyarabu Herd. It created a huge buffer around the lake to prevent further activity and was identified by subsistence users as being particularly meaningful to them. So I would push back particularly on those points. And to distinguish what occurred here from Tanaki Springs, I think it's important to look at specifically, in that case, the agency considered no alternatives that varied from what it assumed was necessary under the contract itself. And the court was concerned with the agency's position that this old contract that predated NEPA and ANILCA in some way might preempt those statutes. That's not what we have here. We have BLM carefully looking at these action alternatives in detail. But then also in the extensive Appendix D, going through piece by piece for 60-plus alternative design concepts and figuring out which one of those could be incorporated into the alternatives studied in detail and which would be excluded because they were inconsistent with the project. It wasn't that BLM just tersely rejected those. BLM mapped out a number of those. It incorporated some of those aspects and explained why others were not appropriate. And then in terms of the indirect versus direct impacts and the claim that Alternative E didn't meaningfully reduce impacts, I think most of the focus, again, is on the language regarding direct impacts from the project. BLM also explained that the reduced infrastructure in Alternative E, modified Alternative E, would reduce caribou deflection and that would definitely reduce impacts to subsistence uses and needs. So, I think when you look more fully at BLM's analysis, both in the NEPA context and in the ANILCA context, it shows that they complied with their statutory obligations. No further questions? Thank you. Mr. Morgan? Good morning, Your Honor. May it please the Court, my name is Patrick Munson. I'm here to represent CUPIC Corporation as a defendant in this matter. Before I start, I want to thank President Kopiak from CUPIC Corporation for joining me today representing the entire CUPIC Board of Directors. That's 11 shareholders who were elected by the CUPIC, the Alaska Native shareholders of CUPIC Corporation, really to pursue one goal, which is to do what they think is best for the Alaska Native shareholders of NUIX in Alaska. I want to jump into the only issue that CUPIC has ended up briefing before this Court, which is ANILCA Section 810, but I want to go right to the heart of the matter, which you pointed out, the ANILCA 810 claim here does indeed rise and fall with the NEPA claim. So this discussion of full field development is critical to both claims, and in fact, I would argue inseparable, which makes sense because if you look at the case law, there actually is no cases that I'm aware of where there is a violation of ANILCA 810 found that is independent from a NEPA violation. So at the end of the day, that is the focus here. I think CUPIC is well positioned to add a little context to this discussion about full field development because the concept of full field development, when we think about it, has nothing to do with how much oil comes out of the ground. It has to do with when you're standing out on the tundra looking around and wondering what the development is going to look like, what is it going to look like on the surface? What amount of infrastructure does it take to fully develop the resource in a particular area? And as Mr. Morgan pointed out, the statutory and regulatory scheme has decided and structured all of that process in a way that revolves around unit development. You look at a large area of connected hydrocarbon resources and decide how to most efficiently develop that resource, that target pool. In this case, we're talking about the Beartooth unit. So you don't look at a small part down here and then a different part up here. You take a holistic look at the entire unit and ask, what would it take to develop that entire connected amount of hydrocarbons? There's a master development plan. There's a regulation that required Conoco to put together a master development plan that says exactly that. If UBLM allow us to develop this entire unit, this is how we would do it. That's the master development plan. That creates kind of a baseline proposal. BLM then goes in and thinks about different ways, consults with people like Kupic to develop alternatives that achieve the same basic purpose, with the same basic purpose, again, being to develop the entire connected resource, not part of it, but all of it, so that we can at least understand what that would look like. If we were going to develop this entire resource, what would that look like? What would the impacts be? And so in your view, once the agency receives that master plan and the vision of a full development, to what extent is the agency able to do mitigation measures that are more along the lines of excluding certain regions or areas or something broader than what the developer would want? That is precisely where the balancing aspects of the other relevant statutes and the leases themselves come into place. The leases themselves contain, at sections four and six of the leases, the ability for the government to impose reasonable mitigation measures to reduce impacts. Now it will be up to BLM to decide what a reasonable mitigation measure consistent with that authority is. If Conoco believes they overstepped their authority, then Conoco has the ability to push back and say, no, no, that's not a reasonable mitigation measure. We have the ability to go farther than that. So there's an interplay between both the leaseholder rights and the government's ability and willingness to push and constrain Conoco's ability to get to the oil. And in this case, again, that's exactly what happened. BLM looked at the big picture of development and understood that as a rational economic actor, Conoco would want to go into certain areas and would be likely to want to pursue development there. So it made no sense to just cut off part of the pool and say, we're going to analyze something that doesn't recover oil from this particular part of the pool. It doesn't make sense to make that assumption because, again, they have to treat Conoco as a rational actor who is going to want to do that and who at some point is going to push back and say, no, we think we have the right to go up there and pursue that oil. But what, you know, but plaintiffs are making the point under ANILCA, the agency also has to consider the use of subsistence land. And maybe they would want to say we should carve out a portion of that to be untouched. Even if Conoco wants to, you know, has this plan for more development. And why couldn't the agency constrain development in that sort of way? The agency can limit impacts on the surface, which may have the side impact of limiting recovery of oil. But the agency does have the ability to mitigate and even to decide, as they did in this case, to decide to disapprove a particular drill site. And again, in this case, you could argue that Conoco could have looked at that and pushed back and said, no, we have more lease rights than this acknowledges and challenged that. They didn't do that. They preferred to go along with this idea because I think, like CUPIC, Conoco was able to come to the conclusion that this level of development appropriately balances recovery and impacts in a way that CUPIC agreed was acceptable, Conoco agreed was acceptable enough, and that BLM agreed satisfied its substantive obligations under both the NPRPA and ANILCA 810 and allowed it to make the findings under ANILCA 810 that it was required to make, namely that reasonable mitigation measures had been taken to reduce impacts of subsistence and that the approved version of the project involved the minimal amount of land necessary to achieve the purposes of the project. And that's one of the keys that is consistently left out of the plaintiff's discussion of ANILCA 810. ANILCA itself is not a conservation statute. It's not a subsistence protection statute. It is the next chapter in a historical effort of Alaska to distribute lands. The Alaska Statehood Act, ANCSA, and then ANILCA all tried with varying degrees of success to set up processes by which land was distributed in Alaska. ANILCA was intended to break the log jam that existed in 1980 under the Statehood Act and ANCSA by putting in new processes, more processes, going ahead and designating some lands, some for conservation, but many, many lands for oil and resource development, mineral development, and studies for further development of that nature. So, ANILCA 810 is one of the processes within ANILCA. It is part of a land distribution process that says when the federal government is making decisions about how to distribute land in Alaska or how to use lands in Alaska, it must consider the impacts of those decisions on subsistence. That's what BLM did here at Appendix G of the final SEIS. Considered the impacts to subsistence. If it makes a positive determination there and agrees, yes, there could be significant restrictions of subsistence uses as a result of this decision, then the next step of ANILCA 810 is triggered. They put out formal notices and invite potentially affected subsistence users, like the community of Nuiqsut, to come into the room and participate in a hearing, in a face-to-face discussion with BLM to talk about subsistence concerns and to suggest reasonable mitigation measures. Of those, BLM listens, hears them, as they absolutely did in this case, as evidenced by the long list of mitigation measures that have been imposed, many of which were proposed by CUPC, by the local tribal entities around Nuiqsut, some of them even from the plaintiffs. Once those measures are put into the project, at that point, BLM looks at the new version of the project, which includes all of these mitigation measures, and is able to make those findings under ANILCA 810. Only at that point is it able to make those findings under ANILCA 810 that says, we've done our job here. We've satisfied the substantive goal of ANILCA 810, which is to put mitigation measures in place that will reduce the impacts on subsistence. And that is exactly what they did here. And CUPC agrees with all of that. CUPC agreed for the first time that Alternative E was the first version of the project that actually would support that finding that BLM ultimately made. CUPC has been arguing about ANILCA 810 for a long time. We have pointed out consistently that there were reasonable mitigation measures that BLM was leaving on the table, and therefore, we felt they had not gone far enough in reducing the impacts to subsistence. Eventually, they put in enough reasonable mitigation measures, including this million acre conservation area that Ms. Collier referred to, that offset impacts to the caribou and other important subsistence resources in the area, and made CUPC comfortable that, okay, we may not have gotten everything we wanted here. There are other things that probably could have been done to reduce impacts further here and there. But on the whole, these mitigation measures are reasonable and allow the project to go forward. That's the point of ANILCA 810, and we believe it succeeded here. Okay. Thank you, Mr. Munson. I appreciate the perspective. Thank you very much. Let me see if Judge Forrest has any other thing. Okay. Appreciate it. Thank you. Thank you. To clarify a point on the Reserves Act and the leases, that there may be development in Teshekpuk Lake contemplated more broadly, that does not mean that when looking at a specific project, that development is mandated. BLM still has the authority to deny a project or constrain it and to look at other options, and that is consistent with Conoco's leases as well as the Reserves Act. And Conoco's obligation to submit a plan showing the full scope of what it proposes to do does not, in turn, force the agency to then adopt that plan. Neither the Reserves Act nor Conoco's leases here require full field development. The mandatory protections in the Reserves Act continue to apply even after BLM issues a lease. Conoco's leases expressly state that they are subject to the Reserves Act as well as other laws like ANILCA. This is not about deferring to the agency. This is about BLM's legal error. BLM misinterpreted the Reserves Act and limited the scope of what it considered to full field development. That interpretation ignores its other statutory mandates under the Reserves Act and ANILCA and limited the scope of what it considered under NEPA. This is a question of law. Third, regarding the ANILCA and the Reserves overlap, this Court has held that the NPRPA and ANILCA must be read together. So, interpreting the Reserves Act's full field development mandate, even if it were to exist, to overcome ANILCA would be contrary to Congress' intent in enacting ANILCA. Here, even with the mitigation measures as well as the assumption that the agency was going to allow three drill sites, BLM still found in the SEIS that there would be significant impacts to subsistence. The elimination of the one pad in the Record of Decision did not change that or change that many of the most impactful elements of this project were still approved. But regardless, whether or not Alternative E reduced some of the impacts, including in the ROD, the real point here is that had BLM not treated the oil and gas program as overriding these other protective mandates and limiting its authority, it could have considered a To conclude, we would ask that this Court reverse the decision of the District Court and vacate BLM's decisions, and we would also ask that this Court grant the parallel motion for an injunction pending appeal to halt construction activities and maintain the status quo while it decides this case. Thank you. I don't have any other questions, but I thank Council for your very helpful arguments, and the matter will stand submitted and Court is adjourned. Thank you.
judges: NELSON, FORREST, SANCHEZ